UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CASE NO. 5:24-CR-00439-2 |
| | § | |
| OSCAR AXEL FLORES | § | |

### GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS

**COMES NOW** the United States of America by and through its attorneys, Alamdar S. Hamdani, United States Attorney for the Southern District of Texas, and Bryan L. Oliver, Assistant United States Attorney, and files this response to Defendant Flores's ("Flores") Motion to Suppress Evidence. Dkt. 44.

### STATEMENT OF FACTS

On March 25, 2024, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") learned of multiple suspicious firearm purchases made by Mario Alberto Tovar Jr. ("Tovar") that occurred in Laredo, Texas, over the preceding weeks. During routine intelligence analyses, it was discovered that Tovar purchased one Century Arms 5.56-millimeter rifle on February 5, 2024; one Panther Arms 5.56-millimeter rifle on March 5, 2024; two identical Taurus 9-millimeter pistols on March 13, 2024; one Aero Precision 5.56-millimeter rifle on March 14, 2024; and two identical Smith & Wesson 9-millimeter pistols on January 25, 2024. One of the Taurus 9-millimeter pistols purchased by Tovar on March 13, 2024, was recovered in Mexico by Mexican law enforcement on March 26, 2024. The purchase of several firearms within a short

1

time—especially those of similar caliber—and the recovery of a recently purchased firearm in Mexico caused investigators to inquire further.

ATF agents visited the various locations where Tovar made the firearms purchases and took custody of all pertinent ATF Form 4473s. At El Bufalo Pawn on San Bernardo on March 26, 2024, agents spoke with the manager who told them that Tovar was accompanied by another male and a female that had blonde hair during the March 14 purchases. The manager told agents that the trio purchased firearms with cash and that Tovar and Flores claimed to be cousins when asked about the matching address on their identification cards. Agents also learned that the group went to other El Bufalo Pawn stores.

Agents obtained and reviewed multiple surveillance videos to further their investigation. Video surveillance showed that at about 3:45 p.m. on March 14, 2024, Flores and Tovar entered El Bufalo on San Bernardo; Tovar can be seen wearing red basketball shorts and dark colored shoes while Flores is wearing blue jeans and red shoes. In addition to the rifle mentioned above that was purchased by Tovar, Flores purchased an Alex Pro Firearms 5.56-millimeter rifle.

They then went to another El Bufalo Pawn, this time on Mines Road. At approximately 4:50 p.m., a black Nissan Altima arrived at the store with three occupants. When they got out of the car, Tovar and Flores can be seen wearing the same clothes from the previous surveillance footage. They are also accompanied by a female with blonde hair and tattoos who is later identified as Angela Ruby Ponce

("Ponce"). They all entered the store together and shopped for several guns as a group. Flores ultimately purchased a Savage Arms 5.56-millimeter rifle.

Later that same day around 7:20 p.m., the group drove back to the El Bufalo Pawn on San Bernardo in the same black Nissan Altima wearing the same clothes. They entered the pawn store together and Ponce purchased a Radical Firearms 7.62-millimeter rifle. After some discussion and paperwork, the trio left the store without the firearm because—as agents later learned—Ponce's purchase was placed on hold until March 29, 2024, because she was under 21 years old.

ATF agents established an operation plan to observe Ponce when she retrieved the firearm to determine whether she was engaged in firearms trafficking activity. Agents established surveillance outside of El Bufalo Pawn on San Bernardo on March 29 and April 1, but Ponce did not appear on those days. On April 2, 2024, a representative of El Bufalo Pawn called agents to inform them that Ponce was at the store to retrieve the firearm. Agents then established surveillance outside of the store. They observed the same black Nissan Altima parked in the parking lot of the store that they saw earlier on surveillance footage. Shortly thereafter agents observed Ponce leave the store with the Radical Firearms 7.62-millimeter rifle in her hands and enter the front passenger seat of the black Nissan Altima.

The car then drove south on San Bernardo Avenue, in the direction of Mexico. Agents maintained surveillance on the car and informed local law enforcement and Customs and Border Protection of possible firearms trafficking to Mexico. The car proceeded to drive to the downtown area near the international bridge. At the

3

intersection of Convent Avenue and Zaragoza Street, the car came to a stop and Ponce got out without the firearm. Simultaneously, Flores got out of the rear passenger seat and got into the front passenger seat. The car then drove away.

Ponce was soon detained attempting to enter Mexico via the pedestrian bridge. The car drove in circles in the downtown area for several minutes before Laredo Police Department officers initiated a traffic stop for failure to signal at the required distance before turning. Upon coming to a complete stop, Tovar immediately got out of the driver's seat and approached officers. Officers asked Tovar if anyone else was in the car and he explained that Flores was in the car. Officers approached Flores on the passenger side of the car and asked whether there were any firearms. Flores told officers that there was one firearm in the backseat of the car. The weapon that was recovered was the Radical Firearms 7.62-millimeter rifle that Ponce purchased earlier. Both Flores and Tovar were arrested.

Ponce was read her *Miranda* rights to which she acknowledged her understanding and signed ATF Form 3200. She then provided a statement to agents. Ponce admitted that she purchased the Radical Firearms rifle with money from Tovar for people associated with the Cartel del Noreste ("CDN"). Ponce admitted that she knew Tovar had purchased firearms for the CDN previously. She expected to be paid $200 upon the firearm arriving in Mexico and being transferred to a member of the CDN.

Flores was read his *Miranda* rights to which he acknowledged his understanding and signed ATF Form 3200. He then provided a statement to agents.

4

He explained that Tovar is his cousin. He claimed ownership of the Nissan Altima. He admitted that he and the other defendants went to El Bufalo Pawn to purchase firearms. He admitted that the firearm was intended for someone associated with the CDN. Flores explained that he had purchased firearms on behalf of the CDN at least four other times. He stated that he would be paid for smuggling the firearms into Mexico. He claimed that he was recruited by Tovar and that he knew Tovar had smuggled firearms in the past for the CDN.

Tovar was read his *Miranda* rights to which he acknowledged his understanding and signed ATF Form 3200. He then provided a statement to agents. Tovar admitted that he was hired by a member of the CDN to smuggle firearms to Mexico. He stated that he provided the money that Ponce used to purchase the Radical Firearms rifle. He also admitted to purchasing several other firearms and ammunition for the CDN previously. He stated that every firearm he purchased was transferred to the CDN.

## RESPONSE

### A. The vehicle stop was supported by reasonable suspicion.

"The Fourth Amendment prohibits unreasonable searches and seizures." *United States v. Wright*, 57 F.4th 524, 530 (5th Cir. 2023). "A temporary, warrantless detention of an individual constitutes a seizure for Fourth Amendment purposes and must be justified by reasonable suspicion that criminal activity has taken or is currently taking place; otherwise, evidence obtained through such a detention may be excluded." *Id.* (Internal quotation marks omitted). Reasonable suspicion that

criminal activity has taken or is currently taking place exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, justify the stop. *United States v. Pack*, 612 F.3d 341, 352 (5th Cir. 2010). The standard for reasonable suspicion "falls considerably short of satisfying a preponderance of the evidence standard." *Id.* The reviewing court must look at the totality of the circumstances including the collective knowledge of the officers involved.[1]

Prior to initiating the traffic stop, agents knew that at least one firearm purchased by Tovar was recovered by law enforcement authorities in Mexico within two weeks of its purchase. Agents knew that Tovar, Flores, and Ponce went to two different El Bufalo Pawn stores together on March 14, 2024, in a black Nissan Altima. Agents knew that Flores purchased two rifles and that Tovar and Ponce purchased one rifle each. Agents were informed by El Bufalo Pawn staff that the firearm purchased by Ponce was on hold due to her age. Upon reviewing the ATF Form 4473 for Ponce's purchase, agents knew that she resided in the United States. Agents were also aware that at least eight other firearms were purchased by Tovar and Flores that were the same or similar makes, models, and calibers.

---

[1] *United States v. Zuniga*, 860 F.3d 276, 283 (5th Cir. 2017):

> Under the collective knowledge doctrine, an officer initiating the stop or conducting the search need not have personal knowledge of the evidence that gave rise to the reasonable suspicion or probable cause, so long as he is acting at the request of those who have the necessary information. *See United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999). In other words, the collective knowledge theory applies so long as there is "some degree of communication" between the acting officer and the officer who has knowledge of the necessary facts.

Based on that information, agents suspected that firearms trafficking was occurring—either domestic and/or international trafficking. Again, the purchase of several firearms within a short time of the same make, model, and caliber coupled with the short time between purchase and recovery by Mexican authorities of at least one firearm purchased by Tovar raised agents' suspicion to further investigate Tovar's activity. Upon further investigation of Tovar's activity, agents identified Flores and Ponce as associates of Tovar that had previously purchased and were currently purchasing firearms. Flores and Ponce were also purchasing those firearms in the presence of Tovar while appearing to be joking and having friendly conversation.

Agents developed an operation plan based on the aforementioned information to determine whether the defendants were engaged in conduct consistent with firearms trafficking. Agents set up surveillance outside of El Bufalo Pawn on March 29 and April 1, but the defendants did not appear on those days. On April 2, 2024, a representative of El Bufalo Pawn called agents to inform them that Ponce was at the store to retrieve the firearm that she had purchased on March 14. Agents saw Ponce get into the black Nissan Altima *with* the weapon—the same Nissan that agents saw all three defendants occupy in surveillance footage. They observed the car travel towards Mexico and stop near the international bridge in downtown Laredo. Agents then saw Ponce get out of the car *without* the firearm and walk towards Mexico. Agents were able to determine that Flores was one of the passengers of the car when he switched seats.

ATF agents shared these facts with their law enforcement partners, including the Laredo Police and U.S. Customs and Border Protection. Agents not only suspected that criminal activity had taken place—Tovar's firearms being recovered in Mexico—but also that it was currently taking place. At minimum, agents suspected that the firearm was acquired under false pretenses and was possibly the object of straw purchasing.[2] At worst, agents suspected that the defendants were scouting for law enforcement presence at the international bridge to determine the optimal time to cross the firearm into Mexico.[3]

Accordingly, at the time of the stop, there were specific and articulable facts within the collective knowledge of the agents that criminal activity had taken *and* was currently taking place.

Notwithstanding all of the aforementioned facts within the knowledge of the agents at the time of the stop giving rise to reasonable suspicion, a wholly independent basis for reasonable suspicion existed for the stop; that is, the traffic violation by Tovar for failing to signal at the required distance before turning.[4]

**B. The arrest of Flores was supported by probable cause.**

---

[2] When Ponce purchased the firearm, she claimed on ATF Form 4473 that the firearm was intended for her own use and that she lived in the United States. However, immediately after purchase she left the weapon with someone else and attempted to enter Mexico which is indicative of a violation of 18 U.S.C. § 922(a)(6) and potentially 18 U.S.C. § 932.

[3] 18 U.S.C. § 554.

[4] It is axiomatic that the commission of a traffic violation is itself sufficient probable cause to justify a traffic stop. *United States v. Spears*, 636 F. App'x 893, 898-99 (5th Cir. 2016). Even an allegedly pretextual traffic stop is permissible so long as "the officer making the stop 'h[as] probable cause to believe that a traffic violation has occurred.'" *United States v. Huerta*, 252 F. App'x 694, 695 (5th Cir. 2007) (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)).

"A warrantless arrest is justified if the arresting officers had probable cause to believe that the defendant committed a felony." *United States v. Ochoa*, 667 F.3d 643, 649 (5th Cir. 2012). "Probable cause for a warrantless arrest exists when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Id.* (Internal quotation marks omitted). "The officer making the arrest need not have direct knowledge of all of the facts establishing probable cause, as long as he has communicated with the officer who does." *Id.* "Agents evaluating whether probable cause exists are permitted to rely on their specialized training and experience." *United States v. Sanchez-Gonzalez*, 269 F. App'x 344, 347 (5th Cir. 2008).

Short of reciting all the facts supporting reasonable suspicion, agents suspected that the defendants were trafficking firearms. Or again, at least that Tovar and Flores were in possession of a firearm Ponce straw purchased for one or both of them. The defendants were stopped upon that suspicion and also on the fact that Tovar committed a traffic violation. Once the car came to a complete stop, Tovar quickly got out of the car and approached the officers. Despite the concerns of being approached by a suspect during a traffic stop who is possibly in possession of a firearm, officers calmly asked Tovar if he was the only occupant of the car. Officers then approached the passenger side of the car after Tovar informed them that Flores was in the car. Officers asked Flores to step out of the car and if there were any firearms in the car. Flores told officers that there was one firearm in the backseat.

9

Based on the information they had prior to the stop, officers reasonably believed that the firearm was the object of a felony offense being committed by the defendants. Once agents confirmed that they detained the same people that were the subject of the investigation and that those subjects were, in fact, in possession of the firearm, Tovar and Flores were arrested. Therefore, ample probable cause existed to arrest the defendants.

## C. The exclusionary rule does not apply here.

Even if the Court were to determine, *arguendo*, that the evidence was obtained in violation of the Fourth Amendment, it should not be excluded. The suppression of evidence is an exacting remedy that should be used sparingly. *Utah v. Strieff*, 579 U.S. 232, 237 (2016). Evidence should only be suppressed where doing so would deter the wrongful conduct of officers and where the deterrent affect outweighs the substantial social cost of suppression. *Id.* When officers act reasonably in light of the law existing at the time the evidence was obtained, the evidence should not be excluded under the doctrine of good faith.[5] Here, agents acted reasonably in light of the law and facts known to them at the time.

Agents became aware of Tovar's potentially criminal conduct through passive investigatory means by monitoring a national database maintained by ATF. Agents then acted on that information via active investigatory means by speaking with the employees of the stores where purchases were made. Those conversations led agents to documentation and video surveillance that confirmed information they had thus

---

[5] "In our Circuit, the good faith exception applies to warrantless arrests." *United States v. De Leon-Reyna*, 930 F.2d 396, 400 (5th Cir. 1991)

far obtained, while also revealing more information. That additional information was the fact that Ponce and Flores were acting in concert with Tovar. Agents then followed up on the group at the earliest possible time which was within one week of the inception of their investigation. When agents followed up, they created and executed an operation plan that consisted of surveillance. Agents' investigative knowledge was confirmed when the group picked up a firearm and drove toward Mexico.

It was reasonable and, in fact, prudent for agents to have stopped and arrested the defendants based on the information they had at the time. The actions of the agents reflect classic, judicious, and expert investigatory work that Americans should expect of its finest law enforcement agencies. Agents did not intimidate nor coerce anyone to obtain information. Nor did they disguise themselves or act surreptitiously to gather information. Rather, they identified themselves and their intentions not only to employees of the stores who voluntarily assisted them but also to the defendants.

Suppression of the evidence obtained in this case would upend legitimate law enforcement techniques that have been relied upon for generations. Hence, even if the evidence here were obtained in violation of the Fourth Amendment—though it was not—it was obtained in good faith and should not be excluded.

**D. Flores is not entitled to an evidentiary hearing on his motion to suppress.**

Defendants are not entitled to an evidentiary hearing on a motion to suppress evidence as of right. *United States v. Harrelson*, 705 F.2d 733, 737 (5th Cir. 1983).

11

Rather, a defendant must show that a hearing is warranted by setting forth definite, specific, detailed, and nonconjectural bases *supported by evidence* that, if proven, would justify the relief sought. *United States v. Smith*, 977 F.3d 431, 434 (5th Cir. 2020). In other words, an evidentiary hearing is only required when it is necessary to receive evidence on an issue of material fact. *Harrelson*, 705 F.2d at 737.

Flores merely contends—without evidence—that the information known to the agents at the time of his stop and arrest did not rise to level of reasonable suspicion or probable cause. However, his conclusory and conjectural, self-serving statements are inadequate to raise an issue of material fact warranting an evidentiary hearing.[6] In fact, Flores's motion is devoid of any evidence that would justify the relief sought.

## CONCLUSION

For the foregoing reasons the government respectfully requests that this Court deny Defendant's Motion to Suppress without an evidentiary hearing.

Respectfully submitted,

ALAMDAR S. HAMDANI
UNITED STATES ATTORNEY

---

[6] "[C]onclusory allegations, unsubstantiated assertions, or only a scintilla of evidence cannot on their own create a genuine issue of material fact." *Favela v. Collier*, 91 F.4th 1210, 1213 (5th Cir. 2024).

12

Bryan L. Oliver

Assistant United States Attorney

13

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that May 31, 2024, a true and correct copy of the Government's Response to Defendant's Motion to Suppress was electronically filed with the Clerk of the Court using the CM/ECF System, which will transmit notification of such filing to all counsel of record.

_____

Bryan L. Oliver

Assistant United States Attorney