United States District Court
Southern District of Texas

**ENTERED**

September 03, 2024

Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **V.** | § | **CRIM. ACTION NO. 5:24-CR-439-1 & 2** |
| | § | |
| **ANGELA RUBY PONCE &** | § | |
| **OSCAR AXEL FLORES** | § | |

## MEMORANDUM & ORDER

Defendants Angela Ruby Ponce and Oscar Axel Flores stand charged with various crimes relating to an alleged conspiracy to transport firearms from the United States to Mexico. (*See* Dkt. No. 29). Specifically, the Defendants are charged with: one count of conspiracy to smuggle goods from the United States in violation of 18 USC §§ 554, 371; one count of exporting and sending, and attempting to export and send twelve firearms from the United States to Mexico in violation of 18 USC § 554; one count of conspiracy to traffic firearms in violation of 18 USC §§ 933(a)(2), (a)(3); and one count of straw purchasing and attempting to make a straw purchase, in violation of 18 USC § 932(b)(2).[1] (Dkt. No. 29 at 1–5).

Pending before the Court are Defendant Ponce's Motion to Suppress Evidence, (Dkt. No. 47), and Defendant Flores' Motion to Suppress Stop, Search, and Statement Evidence, (Dkt. No. 44). Defendants Ponce and Flores argue that an investigation by agents from the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") concerning the Defendants' gun purchases did not constitute probable cause to arrest Ponce and Flores without a warrant. Ponce further seeks suppression of her post-arrest statement, arguing that she did not knowingly and voluntarily waive her constitutional rights during a custodial interrogation.

The Court held a combined hearing on the motions on July 15, 2024. (*See* Min. Entry July 15, 2024). For the reasons discussed below, the Court finds that Defendants Flores and Ponce's arrests were made upon sufficient probable cause. However, Defendant Ponce's post-arrest statement will be suppressed.

---

[1] "Straw purchasing" refers to the crime of one person buying a gun for someone else—typically a person who is ineligible to purchase or possess a firearm.

## I.   Probable Cause for the Warrantless Arrests

### A. Factual Findings

The Court makes the following factual findings from the evidence presented at the hearing.

#### 1. *ATF Investigation of Tovar*

On January 25, 2024, Defendant Mario Alberto Tovar purchased two Smith & Wesson 9-millimeter pistols from the retailer Academy Sports & Outdoors in Laredo, Texas. (Gov. Ex. 1 at 2; Dkt. No. 102 at 20). Less than two months later, on March 13, 2024, Tovar purchased two additional 9-millimeter Taurus Armas pistols from El Bufalo Pawn shop on San Bernardo Avenue in Laredo, Texas. (Gov. Ex. 1; Dkt. No. 102 at 19). Academy Sports & Outdoors and El Bufalo Pawn are licensed firearm retailers, and they reported Tovar's multiple firearm purchases to the ATF. (Dkt. No. 102 at 18, 80).

On March 22, 2024, United States Border Patrol Agent and ATF Task Force Officer Miguel Rodriguez ("Agent Rodriguez") received the multiple sales reports from both retailers. (*Id.* at 18). Agent Rodriguez became suspicious of Tovar because in his experience, a person who buys multiple similar weapons in a short amount of time may be either stockpiling the firearms or transferring them to another person. (*Id.* at 20).

On March 27, 2024, shortly after Agent Rodriguez received the multiple sales report, he received a Firearms Trace Summary Report ("FTSR") indicating that one of Tovar's guns had been recovered in Mexico. (*Id.* at 21–22, 25–26; Gov. Ex. 2). Agent Rodriguez testified that a FTSR is generated to the ATF whenever a firearm is recovered by law enforcement. (*Id.*). In this instance, Mexican authorities recovered one of Tovar's pistols on March 26, 2024. (Gov. Ex. 2 at 1; Dkt. No. 102 at 23). The FTSR showed that the recovered gun's serial number matched one of Tovar's Taurus 9-millimeter pistols purchased thirteen days prior, on March 13, 2024. (Dkt. No. 102 at 24; Gov. Ex. 2 at 1).

Tovar did not report the gun stolen or missing. (Dkt. No. 102 at 28). Nor was the gun recovered at a crime scene or incident to an arrest. (*Id.* at 25). Yet, thirteen days after Tovar purchased the gun from El Bufalo Pawn in Laredo, it turned up with unidentified individuals at a checkpoint inspection in Nuevo Leon, Mexico. (*Id.* at 26–27; Gov. Ex. 2 at 1). Agent Rodriguez testified that in Mexico, mere possession of a firearm is a crime. (Dkt. No. 102 at 25).

Agent Rodriguez delved further into his investigation of Tovar. Agent Rodriguez learned that Tovar had "prior encounters with U.S. Border Patrol as a human smuggler." (*Id.* at 36). He also learned that Tovar had been working at an oilfield, but his last known payment from that job was in December 2023, about a month before his first gun purchase. (*Id.*). Agent Rodriguez inspected Tovar's border crossing history and learned that on each date he purchased weapons, he was also either entering or leaving the United States. (*Id.* at 37).

Agent Rodriguez visited the El Bufalo Pawn store on San Bernardo Avenue, Laredo, where Tovar purchased the gun that was recovered in Mexico, and the El Bufalo Pawn location on San Gabriel Avenue, Laredo, where Tovar had purchased other firearms. (*Id.* at 28).[2] He spoke to the employees and reviewed Tovar's firearms transaction records.[3] (*Id.* at 29). Agent Rodriguez learned that, over the course of seven weeks, Tovar had purchased seven pistols and automatic rifles and that he paid cash each time. (*Id.* at 27, 29, 36–37; Gov. Ex. 3).

The El Bufalo Pawn employees told Agent Rodriguez that the last time Tovar bought a gun, two other individuals were with him. (Dkt. No. 102 at 29). Employees told Agent Rodriguez that the two other people—later identified as Defendants Ponce and Flores—also purchased guns. (*Id.* at 37).

### 2. ATF Investigation of Flores and Ponce

Agent Rodriguez viewed surveillance footage taken from the interior and exterior of both El Bufalo Pawn locations. In total, the footage spanned from 3:43 p.m. to 7:47 p.m. on March 14, 2024. (Gov. Exs. 7–11).

The footage first showed Tovar and Flores approach the counter inside the El Bufalo Pawn on San Bernardo Avenue at 3:43 p.m. (Gov. Ex. 7 at 2:14). Tovar clearly appeared comfortable and confident speaking to the employees and handling the guns. (*See* Gov. Ex. 7 at 2:20–3:19). Flores initially stood off to the side, appearing uneasy, alternating between tapping his fingers on the glass display case and standing with his

---

[2] The El Bufalo Pawn store on San Gabriel Avenue is referred to as the "Mines Road location" throughout the hearing on the motions to suppress.

[3] Agent Rodriguez testified that licensed firearms retailers are required to document each firearm purchase and the biographic details of the purchaser on ATF Form 4473. The licensed retailer must keep the records and produce them to the ATF upon request. (Dkt. No. 102 at 29–30).

arms crossed. (*Id.* at 2:22–5:40). Flores eventually handed the employee cash. (*Id.* at 7:52). At no point did Flores hold or physically inspect a weapon. Tovar, on the other hand, held and inspected at least three firearms. (*See id.*). Despite not handling any weapons, Flores purchased an Alex Pro APF-15 Rifle at the San Bernardo location on March 14, 2024. (Gov. Ex. 5 at 5–7).

About an hour later, video footage from the parking lot at the El Bufalo Pawn on San Gabriel Avenue showed a black Nissan Altima with a Mexican license plate pull into a parking space. (Gov. Ex. 8 at 0:29–0:50). Tovar, who was the driver, Flores, and Ponce exited the vehicle and walked into the store. (*Id.* at 1:25–1:39). Footage from the interior surveillance camera showed Tovar leading the group in inspecting weapons and speaking to the store employees.

Agent Rodriguez learned that Ponce attempted to buy a rifle at the El Bufalo Pawn on San Gabriel Avenue but was denied, presumably because she was underage. (Dkt. No. 102 at 38, 55). The surveillance footage showed Ponce and Tovar exiting the San Gabriel store together and getting back in the parked car. (Gov. Ex. 8 at 18:57). Tovar eventually left Ponce in the car and went back into the store to join Flores, who was filling out paperwork. (*Id.* at 20:56). Both Flores and Tovar purchased firearms at this location. Flores purchased a Savage Arms MSR-15 Rifle. (Gov. Ex. 5 at 2–4). Tovar purchased an Aero Precision M4 Carbine Rifle. (Gov. Ex. 6 at 18–20). The exterior surveillance camera showed Tovar, Flores, and Ponce drive away together in the Altima. (Gov. Ex. 9 at 54:00; Gov. Ex. 8 at 53:37).

At approximately 7:20 p.m., Tovar and Flores returned to the El Bufalo Pawn on San Bernardo Avenue, this time with Ponce. (Gov. Ex. 10 at 0:30). Exterior security camera footage showed the Altima enter the parking lot. (*Id.*). The trio walked into the store together. (Gov. Ex. 11 at 1:18).

After checking Ponce's ID, the employee handed her a rifle to inspect. (*Id.* at 2:17). Ponce briefly touched the gun and spent less than a minute inspecting it from on top of the display case before handing the employee a wad of cash from her pants pocket. (*Id.* at 2:22–3:09; 5:40). Ponce's ATF Form 4473 indicates that she purchased a Radical Firearms RF-15 Rifle. (Gov. Ex. 4 at 2). However, due to her age, the firearm transfer was placed on hold until March 29, 2024. (*Id.* at 4; Dkt. No. 102 at 63). The ATF Form 4473 also reflects that Ponce identified her "current state of residence and address" as an

address in Laredo, Texas. (Dkt. No. 102 at 74). Tovar, Flores, and Ponce exited the San Bernardo store together as a group and got back in the Altima. (Gov. Exs. 10, 11 at 24:39).

Agent Rodriguez testified that after viewing the surveillance footage, he expanded his investigation to Flores and Ponce. He observed that Tovar and Flores used the same address on their ATF Form 4473s. (Dkt. No. 102 at 75). He also learned that prior to March 14, 2024, they visited El Bufalo Pawn locations together two other times and made purchases. (*Id.* at 94). Around March 26, 2024, Agent Rodriguez obtained and reviewed the border crossing histories for Flores and Ponce. (*Id.* at 92, 105). He investigated their employment status at the time of March 14, 2024, but could not find any evidence that either of them was employed. (*Id.* at 72–73).[4] However, Agent Rodriguez admittedly did not inquire further into alternative sources of income for Ponce or Flores. (*Id.* at 95–96).

Tovar's seven firearms purchases from January 25 to March 14 made Agent Rodriguez suspicious that Tovar was "buying the weapons for somebody else or smuggling the weapons" out of the country. (*Id.* at 59). Flores' two similar purchases from the two El Bufalo locations on March 14, 2024, and two purchases on March 12, 2024, led Agent Rodriguez to believe Flores was "straw purchasing, trafficking, stuff like that." (*Id.* at 60). Agent Rodriguez testified that Ponce's single purchase was not suspicious in itself, but her association with Tovar and Flores caused him to believe the three were "working together." (*Id.*).

### 3. *Arrests on April 2, 2024*

Agent Rodriguez set up surveillance outside the El Bufalo Pawn on San Bernardo Avenue on March 29, 2024. (Dkt. No. 102 at 62). He expected Ponce to return on that date to retrieve the rifle that had been put on hold. (*Id.* at 63). Ponce did not show up. (*Id.* at 64). However, on April 2, 2024, the manager at El Bufalo Pawn on San Bernardo called Agent Rodriguez to inform him that Ponce was in the store. (*Id.* at 64–65).

Several agents quickly made their way to set up surveillance outside the store. (*Id.* at 66). They saw Ponce exit the store with the rifle and get into the front passenger seat of the Altima. (*Id.*). The agents recognized the car as the same one from the El Bufalo store security videos. (*Id.*). Agent Rodriguez testified that the vehicle "proceeded almost

---

[4] Agent Rodriguez testified that after Ponce's arrest and custodial interrogation on April 2, 2024, he learned that she had been recently hired at Whataburger but had not received a paycheck before her March 14 purchase. (Dkt. No. 102 at 85).

immediately" toward the international pedestrian bridge which goes into Mexico. (*Id.* at 67).

Ponce exited the front passenger side of the vehicle without the weapon she had just retrieved from the store. (*Id.*). Agents could immediately see she did not have the long rifle on her person because she was wearing form-fitting clothes and was not carrying anything aside from a cell phone. (*See id.* at 86). When Agent Rodriguez saw Ponce without the gun, he believed it indicative of firearms trafficking because "she's separating herself from the firearm, she's the legal owner, and she left it in the possession of someone else." (*Id.* at 69).

ATF Agent Priscilla Almaraz saw Ponce near the bridge. (*Id.* at 180). She jogged up to Ponce and called out "Ma'am, ma'am," but Ponce did not react because there was a lot of foot traffic. (*Id.*). Agent Almaraz caught up to Ponce and tapped her on the arm, startling her. (*Id.*). Another ATF agent joined them and the agents both identified themselves, asked Ponce where she was going, and whether she had her ID on her. (*Id.* at 181). Ponce responded that she was going home to Mexico. (*Id.*).

Agent Almaraz told Ponce that they needed to talk with her, and that "she had to come with us." (*Id.*). She testified that Ponce "said something to the effect of no, so we grabbed her, turned her over, handcuffed her, [and] told her she was under arrest." (*Id.*). According to Agent Almaraz, Ponce initially struggled and raised her voice, but finally stopped and submitted to Agent Almaraz's "minimal force" in handcuffing her. (*Id.* at 183–84). The agents transported Ponce to the Laredo ATF field office for questioning. (*See* Gov. Exs. 20, 20A).

From the time the Altima left El Bufalo Pawn on San Bernardo, Agent Rodriguez was on his radio calling out the direction and movements of the car and its occupants to other law enforcement officers. (Dkt. No. 102 at 71–72). Laredo Police Department ("LPD") Officer Jesus Garza was listening to the "call outs" on the radio channel. (*Id.* at 143–44). The ATF agents instructed the LPD unit to tail the Altima and conduct a stop once they observed a traffic violation. (*Id.* at 163, 166). It was known to all law enforcement that the rifle Ponce had just picked up from the El Bufalo Pawn store was still in the car. (*Id.* at 144).

Officer Garza observed the Altima commit a traffic violation. (*Id.*). He then initiated a traffic stop on the car, which had turned into a private driveway. (*Id.* at 149–

50; Gov. Ex. 13). Immediately, Tovar exited the driver's side of the vehicle and approached Officer Garza. (Dkt. No. 102 at 150–51; Gov. Ex. 13 at 1:34–1:39). Officer Garza asked Tovar in Spanish whose car it was, and Tovar responded in Spanish that it was his cousin's car. (Gov. Ex. 14 at 0:09–0:14). Officer Garza could see there was no silhouette of a firearm in Tovar's waistband. (Dkt. No. 102 at 151).

Officer Garza then approached the passenger side of the Altima, where Flores was sitting. (Dkt. No. 120 at 154). He asked Flores in Spanish whether there were any weapons in the vehicle, to which Flores replied, in Spanish, "Yes." (*Id.*, Gov. Ex. 14 at 0:28–0:31). Without a warrant or consent, Officer Garza removed the gun from the vehicle. (Dkt. No. 102 at 165; Gov. Ex. 14 at 0:44–0:54; 9:21).

LPD Officer Garza issued a written citation to Tovar for failing to use a turn signal at the required distance. (Gov. Ex. 17). ATF agents arrested Flores without an arrest warrant. (Dkt. No. 102 at 103, 161–62).

## B. Legal Standards

### 1. *Probable Cause*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." In accordance with common law, a warrantless arrest is reasonable if the arresting officer has probable cause to believe a criminal offense has been or is being committed. *See, e.g.*, *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *United States v. Ramirez*, 145 F.3d 345, 352 (5th Cir. 1998).

The Supreme Court defines the principal components of probable cause as the events leading up to the arrest, and whether the events, viewed from the standpoint of a reasonable police officer, amount to probable cause. *Ornelas v. United States*, 517 U.S. 690, 696 (1996). "The first part of the analysis involves only a determination of historical facts, but the second is a mixed question of law and fact: … the issue is … whether the rule of law as applied to the established facts is or is not violated." *Id.* at 696–97 (internal quotation marks omitted) (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19 (1982)). In determining whether probable cause exists, "[a] trial judge views the facts of a particular case in light of the distinctive features and events of the community;

likewise, a police officer views the facts through the lens of his police experience and expertise." *Id.* at 699.

"[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Maryland v. Pringle*, 540 U.S. 366, 370–71 (2003) (citing *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). The probabilities are not technical; "they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175 (1949). Since probable cause depends on the totality of the circumstances, it is incapable of precise definition or quantification into an exact percentage. *Pringle*, 540 U.S. at 371.

However, it is settled law in the Fifth Circuit that the arresting officer's knowledge must establish only a "fair probability that a crime occurred." *See United States v. Nunez–Sanchez*, 478 F.3d 663, 666–67 (5th Cir. 2007) (quoting *United States v. Garcia*, 179 F.3d 265, 269 (5th Cir. 1999)). "[T]he requisite 'fair probability' is something more than a bare suspicion, but need not reach the fifty percent mark." *Garcia*, 179 F.3d at 269.

### 2. Burden of Proof

In a motion to suppress, the defendant typically has the burden of proving that the evidence to be suppressed was obtained unconstitutionally. However, if the search or seizure at issue occurred without a warrant, the burden shifts to the government to show that the search or seizure was made with probable cause. *See United States v. Guerrero–Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).

Here, ATF agents seized both Ponce and Flores when they arrested them without a warrant. Thus, the Government carries the burden of proving that the ATF agents had probable cause that both Ponce and Flores had been or were in the process of committing a crime.

### C. Discussion

Ponce and Flores both assert that their warrantless arrests were made without probable cause. Therefore, they seek suppression of their post-arrest statements and of the items found in the Nissan Altima. The Government contends that through the investigation of the Defendants prior to April 2, 2024, the arresting officers had sufficient probable cause to believe Ponce and Flores were engaged in straw purchasing of firearms,

8 / 26

attempting and conspiring to traffic firearms to Mexico, and/or conspiring to smuggle firearms from the United States.

The Government asserts that ATF agents were aware of the following information which, taken in its totality, gave the agents probable cause to arrest Ponce and Flores on April 2, 2024. First, Tovar, Flores, and Ponce visited two different El Bufalo Pawn shop locations in a matter of hours on March 14, 2024, arriving together and leaving in a black Nissan Altima with Mexican plates. In that brief timespan, Flores purchased two automatic rifles, and Tovar and Ponce each purchased one automatic rifle. All their firearms purchases, totaling thousands of dollars, were made in cash. None of the three individuals had a recorded income stream. Based on the Defendants' crossing history reports, all three suspects frequently traveled in and out of Mexico. Agents noted that each day one of the Defendants made a firearms purchase, he or she was also crossing the border. In the weeks prior to March 14, 2024, Tovar had made several other cash purchases of pistols and automatic rifles of similar model and caliber. One of the firearms purchased by Tovar during this time period ended up in Mexico thirteen days after its purchase, with no report of it being stolen or missing. Ponce's rifle purchase had been put on hold due to her age. On April 2, 2024, when notified that Ponce was in the store to retrieve the firearm, agents set up surveillance and saw Ponce get into the Altima with Tovar and Flores and the rifle. They watched the vehicle drive in the direction of Mexico and stop at the pedestrian foot bridge. Agents saw Ponce exit the vehicle without the rifle, thereby leaving the rifle in the possession of Tovar and Flores. Finally, when Ponce was stopped by agents near the international bridge and asked where she was going, she said she was going *home* to Mexico, contrary to the statement of residence in the Form 4473 she filled out for her automatic rifle purchase.

Agent Rodriguez testified that he did not get a warrant before setting up surveillance at the San Bernardo El Bufalo Pawn because he wanted to see where the firearm would end up. (Dkt. No. 102 at 90). On cross examination, Agent Rodriguez admitted that he wasn't sure whether he could have gotten a warrant based on the information he gleaned from his investigation. (*Id.* at 91).

Based on the evidence in the record, the Court finds that the arrests of Flores and Ponce were supported by probable cause. A reasonable officer would believe it was a "fair

probability" that Tovar, Flores, and Ponce were working in concert to traffic firearms, make straw purchases, or smuggle firearms from the United States.

> 1. *Agents had probable cause to believe Tovar, Flores, and Ponce were engaged in a conspiracy.*

ATF Agent Rodriguez testified that through his investigation, he believed that Tovar, Flores, and Ponce were "working together" to commit federal firearms offenses. (*See, e.g.*, Dkt. No. 102 at 60). In the Fifth Circuit, probable cause for a warrantless arrest exists "when the totality of the circumstances within a police officer's knowledge at the moment of the arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Garcia*, 179 F.3d at 268. The Court must consider the totality of the circumstances and the expertise of the arresting ATF agents in its reasonable person analysis. *See id.* at 268–69. Unlike some circuits, the Fifth Circuit does not require that an officer making a warrantless arrest have probable cause for every element of a crime.

Defendants are each charged with conspiracy to smuggle goods from the United States in violation of 18 U.S.C. §§ 554 and 371. (Dkt. No. 29 at 1). The general federal conspiracy statute makes it a crime to "conspire … to commit any offense against the United States." 18 U.S.C. § 371. "Section 371's use of the term 'conspire' incorporates long-recognized principles of conspiracy law." *Ocasio v. United States*, 578 U.S. 282, 287 (2016). "The fundamental characteristic of a conspiracy is a joint commitment to an 'endeavor which, if completed, would satisfy all of the elements of [the underlying substantive] criminal offense.'" *Id.* (quoting *Salinas v. United States*, 522 U.S. 52, 65, (1997)).

The general elements of conspiracy are (1) an agreement between two or more persons to accomplish unlawful ends; (2) a defendant's knowledge of the agreement; and (3) a defendant's voluntary participation. *See United States v. Montgomery*, 210 F.3d 446, 449 (5th Cir. 2000) (citations omitted). The agreement may be implicit, and a factfinder may rely on circumstantial evidence in determining whether a conspiracy exists. *See id.* A factfinder "may rely on presence and association, along with other evidence[;] thus, proof of an overt act in furtherance of the conspiracy is not required. A conspiracy or common purpose may be inferred from the development and collection of circumstances." *Id.* (citations omitted). Additionally, an individual "need not know all the details of the

unlawful enterprise or … the exact number or identity of all the co-conspirators" to be liable. *United States v. Chapman*, 851 F.3d 363, 378 (5th Cir. 2017) (quoting *United States v. Brown*, 727 F.3d 329, 339 (5th Cir. 2013)).

Here, an agreement to accomplish unlawful ends, Ponce and Flores's knowledge, and their voluntary participation are easily inferred from the totality of the circumstances. Ponce and Flores's participation in the timeline and circumstances of the multiple cash gun purchases that occurred in rapid succession, with one of the guns reported as being present in Mexico, gave agents a fair probability that the Defendants were members of a conspiracy to traffic or smuggle weapons to Mexico.

On January 25, 2024, Tovar purchased two handguns. (Gov. Ex. 6 at 2). On February 5, 2024, Tovar purchased an automatic rifle from El Bufalo Pawn, San Gabriel Avenue. (*Id.* at 6–8; Gov. Ex. 3 at 1). He paid $974.24 in cash. (Gov. Ex. 3 at 1). On March 5, 2024, Tovar purchased an automatic rifle from El Bufalo Pawn, San Bernardo Avenue. (Gov. Ex. 6 at 9–11; Gov. Ex. 3 at 5). He paid $822.70 in cash. (Gov. Ex. 3 at 5).

On March 12, 2024, Flores purchased a handgun from El Bufalo Pawn on Highway 83. (Gov. Ex. 3 at 2). Flores paid $313.91 in cash. (*Id.*). On the same date, Flores purchased a similar handgun from El Bufalo Pawn South Meadow Avenue. (*Id.* at 3). He paid $407.01 in cash. (*Id.*).

On March 13, 2024, Tovar purchased two handguns—one of which ended up with unidentified individuals at the Mexican checkpoint thirteen days later. (Gov. Ex. 3 at 4; Gov. Ex. 6 at 12–14). He paid $313.93 in cash for one, and $270.63 cash for the other. (Gov. Ex. 3 at 4).

The next day, on March 14, 2024, Tovar is seen on camera at the two El Bufalo Pawn locations handling and buying guns with Flores and Ponce. (*See* Gov. Exs. 7–11). Flores and Ponce each purchase high-powered assault rifles in cash without handling or inspecting them. (*See* Gov. Exs. 7, 9, 11). Flores purchased an automatic rifle for $811.88 in cash from El Bufalo Pawn San Bernardo Avenue. (Gov. Ex. 3 at 5; Gov. Ex. 5 at 5–7). Flores also purchased an automatic rifle for $901.05 in cash from El Bufalo Pawn San Gabriel Avenue. (Gov. Ex. 5 at 2-4; Gov. Ex. 3 at 6). Tovar purchased an automatic rifle for $757.74 in cash from El Bufalo Pawn San Gabriel Avenue. (Gov. Ex. 3 at 6). Also on March 14, 2024, Ponce purchased an automatic rifle from El Bufalo Pawn San Bernardo. (Gov. Ex. 3). She paid $775.00 in cash. (*Id.*).

11 / 26

Surveillance footage from the two El Bufalo pawn locations on March 14, 2024, shows all three individuals arriving in a single vehicle with Mexican license plates, interacting with each other inside the store, and leaving together in the same vehicle. The totality of the facts, including the rapid succession of multiple firearm purchases in a relatively short period of time, in cash, made as a group—when none had a documented income stream—combined with the fact that one of Tovar's guns was discovered in Mexico, establishes probable cause for Flores and Ponce's presence and association in an unlawful conspiracy. Probable cause is more than a bare suspicion, but less than a preponderance of evidence, and the Court finds that the ATF agents had more than a bare suspicion that the Defendants were engaging in criminal conduct. As such, the agents had probable cause to arrest both Flores and Ponce on April 2, 2024, based on evidence that all three Defendants were engaged in a conspiracy to make straw purchases, or traffic or smuggle firearms from the United States.

The consequence of this determination of probable cause of a conspiracy is that the Court does not look at the individual conduct of Flores or Ponce in a vacuum, separate from the conduct of the other suspects. The activity of each of the suspects is considered in the context of the combined activity of Tovar, Flores, and Ponce. *See Montgomery*, 210 F.3d at 449.

> 2. *There was a reasonably fair probability that Tovar, Flores, and Ponce were engaged in straw purchasing of firearms.*

Agent Rodriguez testified that on April 2, 2024, he had probable cause that Tovar, Flores, and Ponce were engaged in straw purchasing of firearms. (Dkt. No. 102 at 59–60). The criminal statutes for trafficking firearms and for straw purchasing were enacted relatively recently, in 2022. As a result, there is little authoritative case law interpreting these statutes. Prior to 2022, straw purchasing was prosecuted under 18 U.S.C. § 922(a)(6)—for making false statements in connection with acquisition of a firearm.

For example, in *United States v. Ortiz*, the Fifth Circuit upheld the defendant's conviction of conspiracy to make false statements in connection with the acquisition of a firearm. 781 F.3d 221, 227 (5th Cir. 2015). The court found that ATF agents had reasonable suspicion that the defendant was engaged in straw purchasing. *Id.* There, the defendant and an accomplice visited a Houston gun store and spoke with an employee about buying a .50-caliber rifle. *Id.* at 223. The defendant paid about $2,100 in cash for

the gun and filled out ATF Form 4473. *Id.* After purchasing the first rifle, he asked the employee "How many more do you have?" *Id.* at 224. The defendant decided to purchase a second identical rifle and insisted that he pay for it with cash. *Id.* at 223–24. He left to go get more cash even though the employee told him he could use the debit card in his possession. *Id.* Also, this type of rifle was typically sold with a sight,[5] but defendant was not interested in purchasing any. *Id.* The rifles required special ammunition that was sold only at this particular gun store. *Id.* Despite buying two rifles, Defendant only bought one box of ammunition. *Id.* The store employee was trained to detect signs of straw purchasing, and defendant's actions raised red flags. *Id.* at 223.

The employee called ATF agents to report his suspicions. *Id.* at 224. Agents set up surveillance in the parking lot. *Id.* Based on their experience, the agents believed the defendant would go directly to the orchestrator of the straw purchase. *Id.* Agents observed the defendant and accomplice leave the store and place the rifles in the rear hatch of their vehicle. *Id.* The agents tailed the vehicle as it drove erratically. *Id.* The defendant's vehicle stopped at a gas station and agents approached with their weapons drawn, though explicitly telling defendant he was not under arrest. *Id.* at 224–25.

The *Ortiz* trial court denied the defendant's motion to suppress and found that the store employee's information, the erratic driving, and the agents' witnessing defendant put the guns in the back of his car together constituted reasonable suspicion for the ATF agents to stop the vehicle. *Id.* at 226. The Fifth Circuit affirmed, holding that the defendant's question "How many more do you have," his insistence on paying in cash, his decision not to buy sights, and his purchase of only one box of ammunition, constituted reasonable suspicion that defendant "had lied on the Forms 4473 by indicating he was not purchasing the rifles for someone else." *Id.* at 227.

Here, the parties do not dispute that there was reasonable suspicion to stop both Flores and Ponce on April 2, 2024. Instead, Defendants argue that ATF agents did not have probable cause to arrest them without a warrant. Here, ATF agents had more information than did the agents in *Ortiz*, amounting to probable cause.

---

[5] A sight is an optical device used to help a shooter aim their firearm. *Gunsight*, BRITANNICA, https://www.britannica.com/technology/gunsight.

13 / 26

As discussed, *supra*, the ATF agents here had information about Defendants which gave additional context to Ponce's March 14, 2024, firearm purchase and the subsequent in-person surveillance on April 2, 2024. For example, at the time of Flores' and Ponce's arrests on April 2, 2024, agents knew that Tovar had made seven redundant purchases of firearms in cash from multiple retailers. Agents knew that Flores had made four redundant purchases of firearms in cash from multiple retailers. Based on Agent Rodriguez's experience and training, large cash payments are indicative of either illicit activity or illegal activity in which the purchaser is attempting to disguise the source of the funds. (Dkt. No. 102 at 113).

Agents knew that Defendants arrived and left together in the same car with Mexican license plates when they purchased the firearms. Agent Rodriguez testified that while Ponce's single firearm purchase was not in itself suspicious, her close interaction and association with Tovar and Flores was suspicious. (*Id.* at 60). Importantly, ATF agents knew that during the timeframe of the investigation, one of Tovar's purchased guns was recovered by authorities at a checkpoint in Mexico, and Tovar had not reported that gun missing or stolen.

The Government offers the Defendants' border crossing history to explain that each time one of them made a cash purchase, they were either entering the United States from Mexico or leaving to Mexico, suggesting the cash was coming from Mexico. This evidence of Flores' or Ponce's border crossing history is not particularly indicative of any pattern of criminal activity. It shows that Flores and Ponce frequently cross from Mexico into the United States at least once a week. (*Id.* at 120, 122; Gov. Exs. 22A, 23A). These frequent crossings predate the ATF investigation by at least two years. Flores' crossing history shows he made multiple trips a month, dating back to April 2022. (Gov. Ex. 22A). Ponce's crossing history shows frequent trips each month dating back to 2019. (Gov. Ex. 23A). However, this information at least shows that Defendants routinely crossed into Mexico, which would facilitate their ability to transport firearms into the country where one of the subject firearms was previously located.

Also, to be sure, agents had an independent basis to arrest Ponce when they apprehended her at the pedestrian bridge. On Ponce's ATF Form 4473, she indicated that she resides in the United States. (Dkt. No. 102 at 74). Yet, when agents stopped Ponce on the bridge and asked her where she was going, she responded that she was going home

to Mexico. (*Id.* at 181). Therefore, at that moment, ATF agents had probable cause to arrest Ponce for making a false statement in the acquisition of a firearm.

Agents also had a separate basis for probable cause to conduct Flores' traffic stop. LPD Officer Garza candidly admitted to following the Altima on the orders of ATF agents and to find a basis to stop the car. Once he observed the vehicle initiate its turn signal less than the required 100 feet, he could validly stop the car. While investigating the stop, Officer Garza spoke to the residents of the address where the vehicle entered the driveway, and the residents denied knowing the Defendants. (*Id.* at 149–50). During a traffic stop, an officer's subjective intent is irrelevant, so long as an officer has probable cause to believe a traffic violation occurred. *See Whren v. United States*, 517 U.S. 806, 813–14 (1996).

The totality of circumstances of the ATF investigation, including the specific facts above, provided agents with sufficient probable cause to arrest both Ponce and Flores on April 2, 2024, for attempting and conspiring to make straw purchases and/or traffic firearms.

## II.    Ponce's *Miranda* Waiver

Ponce seeks to suppress her post-arrest statement made during her interview with federal agents, asserting that "she did not knowingly and intelligently waive her *Miranda* rights." (Dkt. No. 47 at 7).

### A. Factual Findings

Ponce was taken to the ATF field office in Laredo after her arrest, where she was interviewed by Homeland Security Investigations Special Agent Mark Jensen and ATF Agent Almaraz took in an interrogation room. (Dkt. No. 102 at 170–71).

Before reading Ponce her rights, Agent Almaraz began the recorded interview by asking Ponce, "So you already kind of know why you're here, right?" (Gov. Ex. 20 at 0:15–0:23). Ponce responded, almost inaudibly, "El Bufalo." (*Id.* at 0:19; Dkt. No. 102 at 176). Agent Almaraz replied, "Something like that." (Gov. Ex. 20 at 0:20–0:22).

Agent Almaraz asked Ponce if she spoke English, and Ponce replied, "Both." (Gov. Ex. 20A at 2). Agent Almaraz asked Ponce again "Do you speak English? What do you prefer? English?" (Gov. Ex. 20 at 0:24–0:27). Ponce responded, "Spanish." (Gov. Ex. 20 at 0:29). Agent Almaraz confirmed, "You prefer Spanish." (*Id.* at 0:31). Agent Almaraz then

15 / 26

asked whether Ponce understood English, to which Ponce replied, "Yeah." (Gov. Ex. 20A at 2).

Before reading the *Miranda* warnings, Agent Almaraz asked Ponce biographical questions in English. (Gov. Ex. 20A at 3–10). Ponce responded to the questions in a mix of Spanish and English. (*Id.*). Once Agent Almaraz read the *Miranda* warnings in English, she presented Ponce with a waiver form, also in English. (*Id.* at 11–12).

Agent Almaraz read Ponce the waiver form in English. (*Id.* at 12). Agent Almaraz read the rights together and did not ask Ponce if she understood each separate right. Ponce never stated that she understood her rights. (*See* Gov. Ex. 20 at 6:30–7:27). Instead, Ponce hesitated and asked, "Do I have to sign?" (*Id.* at 13). Referring to the statement in the waiver that said, "No pressure or force of any kind has been used against me," Ponce said in Spanish, "No, well, um, pressure, right now they were grabbing me in a bad way, so." (*Id.* at 12–13). Agent Almaraz replied, in English, that "This is a waiver of these rights … so if you agree to waive these rights, then you sign." (*Id.* at 13). Ponce said, in a mix of Spanish and English, "But you said that no promises or threats have been made to me, and no pressure or force of any kind." (*Id.* at 13–14). Agent Jensen interjected and said, in English, "This is about talking to us, so it's basically if you wanna talk to us or not." (*Id.* at 14). Ponce replied in English, "I mean I can talk to you." (*Id.*) Ponce then signed the waiver of her rights and made incriminating statements.

## B. Legal Standards

### 1. *Miranda Waiver*

Pursuant to the Fifth Amendment, a person may not be compelled to be a witness against themselves in a criminal case. U.S. CONST. amend. V. In *Miranda v. Arizona*, the Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. The Court outlined the specific warnings that an interrogating officer must say to a defendant before conducting a custodial interrogation. *Id.* "The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." *Id.*

A statement is voluntary if it is the "product of a free and deliberate choice" that is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* The validity of the waiver is determined by the totality of the circumstances. *See Miranda*, 384 U.S. at 475–77.

The inquiry into whether a valid waiver has occurred has two distinct dimensions. *United States v. Cardenas*, 410 F.3d 287, 293 (5th. Cir. 2005). First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. *Id.* Second, the waiver must have been made with *full awareness* of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Id.* (citing *United States v. Andrews*, 22 F.3d 1328, 1337 (5th Cir. 1994)).

The voluntariness determination is made on a case-by-case basis and is viewed under the totality of the circumstances surrounding the interrogation. *United States v. Reynolds*, 367 F.3d 294, 298 (5th Cir. 2004). A crucial aspect is the presence or absence of coercive behavior on the part of the government. *Cardenas*, 410 F.3d at 293. The voluntariness of a waiver of Fifth Amendment rights has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986).

Regarding the "full awareness" prong of the waiver analysis, there is no controlling precedent that sets a bright-line rule. However, the Fifth Circuit has considered the following non-exhaustive list of factors in its analysis: a defendant's age, education, criminal history, general familiarity with the criminal justice system, language skills, and demeanor during the interview. *See United States v. Blanco*, No. EP-19-CR-1501, 2019 WL 3781605, at *3 (W.D. Tex. Aug. 12, 2019) (citing *United States v. Collins*, 40 F.3d 95, 98 (5th Cir. 1994); *United States v. Garcia Abrego*, 141 F.3d 142, 170 (5th Cir. 1998)).

With Spanish-speaking defendants in the consent-to-search context, the Fifth Circuit has found a valid waiver when the defendant and officer can sufficiently converse in English. *United States v. Alvarado*, 898 F.2d 987, 991 (5th Cir. 1990) ("[W]here there is sufficient conversation between the suspect and law enforcement officers to demonstrate that the suspect had an adequate understanding of English to fully comprehend the situation, a finding that consent was voluntary may be proper."). District

courts within the Fifth Circuit have applied this reasoning to find that a non-English-speaking defendant's *Miranda* waiver was voluntary, knowing, and intelligent. *See United States v. Hernandez*, No. 14-119-SDD-SCR, 2015 WL 867930, at \*15 (M.D. La. Feb. 27, 2015) (finding Spanish-speaking defendant's waiver voluntary because she communicated with officers in English about the circumstances involving drugs found in her bag); *see also United States v. Constantin*, 422 F. Supp. 3d 1116 (M.D. La. 2019) (finding a valid waiver because the Romanian-speaking defendant affirmatively asked the officers questions and conversed about his criminal charges).

The mere answering of questions is insufficient to show waiver; there must be some affirmative action demonstrating a waiver of a defendant's Fifth Amendment rights. *Collins*, 40 F.3d at 98. The Fifth Circuit has counseled that a defendant signing a written form of the rights is indicative of a valid waiver. *See Collins*, 40 F.3d at 98–99; *United States v. Broussard*, 80 F.3d 1025, 1034 (5th Cir. 1996); *see also United States v. Alvarado-Palacio*, 951 F.3d 341 (5th Cir. 2020) ("A signed waiver form, though not conclusive, is usually strong proof of a knowing and voluntary waiver."). Ultimately, "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 574 (1987) (citing *Moran v. Burbine*, 475 U.S. 412, 422 (1986)).

### 2. Burden of Proof

A defendant bears the burden of establishing that she was subject to a custodial interrogation, such that *Miranda* is applicable. *See United States v. Charles,* 738 F.2d 686, 692 (5th Cir. 1984), *overruled on other grounds by United States v. Bengivenga*, 845 F.2d 593 (5th Cir. 1988) (en banc). If met, the burden then shifts to the government to prove by a preponderance of the evidence that the defendant waived her Fifth Amendment rights. *United States v. Hurtado*, 905 F.2d 74, 76 (5th Cir. 1990). The government bears a heavy burden to prove that the defendant's waiver was voluntary, knowing, and intelligent. *See Miranda*, 384 U.S. at 475.

Here, since the parties do not dispute that Ponce was in a custodial interrogation, the burden is on the Government to prove by a preponderance of the evidence that Ponce's waiver of her Fifth Amendment rights was made knowingly, voluntarily, and intentionally.

### C. Discussion

The primary issue before the Court is whether Ponce, whose first language is Spanish, had full awareness of both the nature of her rights and the consequences of waiving them. The issue is not whether Ponce's statement was coerced, because it was not the product of deception or physical duress. Although Ponce hesitated when Agent Almaraz read the part of the waiver that said, "No promises or threats have been made to me, and no pressure or force of any kind has been used against me," Ponce was referring to the interaction at the bridge when she was arrested. (*See* Gov. Ex. 19, Dkt. No. 102 at 205–06). Ponce told agents, in Spanish, that "Right now they were grabbing me in a bad way." (Gov. Ex. 20A at 13). Since Ponce was referring to the manner in which she was arrested, and not the conditions of the interrogation, the Court finds no force, intimidation, or coercion tainting her statement.

### 1. Ponce did not sign a Spanish waiver form.

In analyzing whether Ponce fully understood her rights, the Court notes that this case is factually unique from others where a non-English-speaking defendant's *Miranda* waiver was at issue. For example, in most cases, an interrogating officer typically presents a Spanish-speaking defendant a *Miranda* waiver form to read in Spanish. *See, e.g.*, *Broussard*, 80 F.3d at 1034 (finding a valid waiver when defendant was read rights in Spanish and received a Spanish *Miranda* card, and after each warning, the officer asked whether he understood); *Alvarado-Palacio*, 951 F.3d at 341–42 (finding a valid waiver when defendant received a written Spanish waiver which he signed and stated that he understood the contents of the form).

Here, Agent Almaraz admitted that although Ponce said she preferred to proceed in Spanish, and there was a Spanish waiver form available, she chose not to use it. (Dkt. No. 102 at 192–93; Gov. Ex. 19). Meanwhile, Flores was in a separate interrogation in the building at the same time, and he was presented with a Spanish *Miranda* form. (Dkt. No. 147 at 3). Agent Almaraz's choice to use an English waiver form when a Spanish form was available is not a per se violation of Ponce's Fifth Amendment rights, despite Ponce's argument to the contrary. (Dkt. No. 102 at 177). Yet, it would have undermined most of Ponce's arguments that she did not knowingly waive her rights. The Fifth Circuit has consistently found Spanish-speaking defendants' waivers to be valid when a Spanish

form is used. Here, the choice to not use the Spanish form weighs against the Government's position that Ponce sufficiently understood the *Miranda* warnings explained solely to her in English before speaking to the agents.

2. *Agent Almaraz interviewed Ponce entirely in English without an interpreter.*

This case is further distinguishable because although Spanish is a language commonly spoken in Laredo, Texas, the interviewing agents were not fluent in Spanish, and they did not use an interpreter for the interview. In other cases, the Spanish-speaking suspect is typically interviewed by a Spanish-fluent officer, or an interpreter is used. For example, in *United States v. Hernandez*, the district court found a valid waiver after the suspect was Mirandized in English. 2015 WL 867930, at *12. There, the officer testified that he could clearly understand what the suspect was saying in English, despite her accent, and that she clearly understood the officer because she would answer each of his questions in English. *Id.* at *12–13. The officer in *Hernandez* testified that if he thought the suspect did not understand, he "would have to get an interpreter which we have access to … that we have used before." *Id.* at *12. The suspect was later Mirandized a second time at the law enforcement office, in Spanish. *Id.* at *13.

Here, Agent Almaraz never testified that she chose to proceed in English because she believed that Ponce was understanding what she was saying, despite the fact that Ponce said she preferred Spanish and predominantly spoke in Spanish during the interview. Instead, she testified the following:

Q: Why did it continue in English?

A: So, first thing is that she's really young, and I know Spanish. I'm pretty good at it. I can't comfortably say that I'm fluent. And this wasn't the type of place where I wanted to risk a miscommunication because she's so young. She was facing federal charges, possibly prison time. So, I wanted her to understand what I was saying.

Q: Is it fair to say that you proceeded in English because you thought it would be more beneficial for Ms. Ponce?

A: Yes. Absolutely.

Q: Why would you ask her what language she prefers if you were just going to speak English anyway though?

20 / 26

> A: For one, that I was prepared that she was going to speak in Spanish. And then second, it's just a force of habit. Every time I do it, every time I do interviews, there's usually somebody else in the room who's more fluent than me. In this case, that was not the case. I was going to have to be the Spanish speaker. So, she said she understood English, so I continued in English.

(Dkt. No. 102 at 177). Although Ponce told Agent Almaraz "Yeah," when asked if she understood English, the Government has not established by a preponderance that Ponce understood her rights when they were read to her in English. (*See* Gov. Ex. 20A at 2). The fact that Agent Almaraz did not find an interpreter for the interview after Ponce told her that she preferred to proceed in Spanish is a fact unique to this case that ultimately does not favor the Government.

### 3. *Ponce never affirmatively indicated that she understood her rights.*

This case is further distinguished because in many cases where a defendant's first language is not English, the interrogating officer will explain each warning or verify that the defendant understands after each warning. *See Broussard*, 80 F.3d at 1034; *Constantin*, 422 F. Supp. 3d at 1119.

For example, in *United States v. Blanco*, the district court found a valid waiver of *Miranda* warnings when the nineteen-year-old Spanish-speaking defendant nodded his head after each warning was read in English. 2019 WL 3781605, at *2. The interviewing agent asked the defendant in English whether he preferred to be advised of his rights in English or Spanish. *Id.* The defendant responded that he understood both languages. *Id.* The agent advised that he would proceed in English, but if he had a question, "then he only need ask; or if [the defendant] felt uncomfortable with the English version of the *Miranda* rights, he could give them to [the defendant] in Spanish." *Id.* The defendant nodded affirmatively that he understood. *Id.* The court noted that the defendant never indicated he was having trouble understanding and did not ask for an interpreter. *Id.* Because the defendant nodded his head after each warning was read, the agent believed that the defendant understood English. *Id.* Also, the agent explicitly asked the defendant if he had any questions about the *Miranda* warnings, to which the defendant said, "No." *Id.* The agent explained, in Spanish, that the defendant needed to acknowledge that he understood his rights by initialing next to each one. *Id.* After the defendant signed the waiver form in English, the agent questioned him in English. *Id.* The defendant

immediately requested that the agent begin the questioning again in Spanish. *Id.* The interview proceeded entirely in Spanish from that point. *Id.*

Here, just before Agent Almaraz read Ponce the Statement of Rights, she explained, in English, "I have to read you your rights. I'm gonna read your rights, and when we're done you're gonna initial, putting your initials here means that you understand what that statement means, okay?" (Gov. Ex. 20A at 11). Nothing in the recording, transcript, or evidence produced at the hearing indicates that Ponce responded. Agent Almaraz immediately began reciting the *Miranda* warnings in their entirety. Once Agent Almaraz concluded the recitation, which lasted approximately twenty-six seconds, she asked Ponce, in English, "Did you understand all of that—yeah? Can you put your initials there?" (Gov. Ex. 20 at 6:30–6:56). Ponce did not verbally respond to that question, but she did follow the directive to initial the paper, as apparently reflected by a twelve second period of silence in the recording as Ponce initialed the English Statement of Rights form. (*Id.* at 6:57–7:09; *see* Gov. Ex. 19).

Since only audio of the interrogation was recorded—not video—there is no evidence that Ponce nodded or responded affirmatively to Agent Almaraz's question about whether she understood. (*See* Dkt. No. 102 at 197–98). Agent Almaraz never paused to explain the rights or verify whether Ponce understood. Nor does Agent Almaraz testify about her impression of Ponce's understanding of her rights.

Agent Almaraz told Ponce that she was going to offer her a waiver form to sign. Agent Almaraz never paused to explain what terms like "waiver" meant or elaborate on any of the *Miranda* warnings. Agent Almaraz said, in English, "If you want to take the time to read it by yourself, you can do that. And once you—and if you agree to that, you're gonna sign and print your name, ok?" (Gov. Ex. 20 at 7:10–7:24; Gov. Ex. 20A at 12). Ponce asked, in English, "If I agree?" (Gov. Ex. 20 at 7:25–7:27). Agent Almaraz said, "Yeah," then proceeded to read Ponce the waiver form in English:

> I have read the statement of my rights, or it has been read to me, and I understand these rights. At this time, I'm willing to answer questions without a lawyer present. No promises or threats have been made to me, and no pressure or force of any kind has been used against me.

(Gov. Ex. 20A at 12). Ponce expressed hesitation about the force used during her arrest. At that point, Agent Jensen interjected, saying, "This is about talking to us, so it's

22 / 26

basically if you wanna talk to us or not." (Gov. Ex. 20A at 13–14). Immediately, Ponce said in English, "I mean, I can talk to you." (*Id.* at 14). Agent Jensen's one-sentence summary did not sufficiently cover the rights that Ponce was guaranteed. Ponce did not acquiesce after Agent Almaraz read the full statements of rights; it was only after Agent Jensen simplified *Miranda* to the choice of wanting to talk to law enforcement or not. Ultimately, the Government bears the "heavy burden" of showing Ponce's knowing, voluntary, and intelligent waiver. *Miranda*, 384 U.S. at 475. Under the facts of this case, the Court cannot say that Ponce's conduct reflects that she knowingly waived her Fifth Amendment rights.

### 4. The Fifth Circuit factors tip slightly in favor of Ponce.

In determining whether a defendant was fully aware of her rights, courts consider factors such as the defendant's age, education, general familiarity with the criminal justice system, language skills, and demeanor during the interview. *See, e.g., United States v. Blanco*, No. EP-19-CR-1501, 2019 WL 3781605, at *3 (W.D. Tex. Aug. 12, 2019) (citing *United States v. Collins*, 40 F.3d 95, 98–99 (5th Cir. 1994); *United States v. Garcia-Abrego*, 141 F.3d 142, 170 (5th Cir. 1998)). The Court addresses each factor in turn.

#### a) Ponce's Age and Experience with the Criminal Justice System

At the time of her interview, Ponce was eighteen years old. (Gov. Ex. 20A at 2, 9). There is no evidence she had any prior experience with the criminal justice system aside from this encounter.

Ponce did not know what the ATF or Drug Enforcement Agency (DEA) were, despite being interviewed for a firearms offense by an ATF agent. In fact, in explaining the ATF to Ponce, she said, "This is how I explain it to little kids, so I hope you understand it." (Gov. Ex. 20A at 16). Ultimately, this factor weighs against the Government, as Ponce was young, unsophisticated, and had no experience with the criminal justice system at the time of her interview.

#### b) Ponce's Education

The Government offers Ponce's school records as evidence that she sufficiently understands English. (Dkt. No. 102 at 188; Gov. Ex. 21). However, the school records do not paint a clear picture that Ponce is proficient in speaking and understanding English. The records show that Ponce was enrolled in English as a Second Language (ESL) classes

throughout elementary school. (*See* Gov. Ex. 21 at 194–96, 216, 233). Ponce graduated the ESL program at the completion of fifth grade and transitioned to all English classes in sixth grade. (*Id.* at 291–92). The last school year completed by Ponce in the United States was the seventh grade. She withdrew halfway through eighth grade to attend school in Mexico, and she dropped out of school before completing the ninth grade. (*Id.* at 109, 112–13). The records also include several English writing samples produced as part of the ESL program. (*Id.* at 84).

At the hearing, the Government highlighted the fact that Ponce received a better grade in her English class than she did in Spanish. (Dkt. No. 102 at 253–54). The records show that in ninth grade, Ponce received a barely passing grade of 70 in English and a failing grade of 65 in Spanish. (Gov. Ex. 19 at 109, 111).

Ultimately, the factor of Ponce's education weighs slightly against the Government. While the records show that Ponce had some instruction in the United States in English, the overall picture they paint is of a person with a seventh-grade education that was provided mainly through an ESL program, who eventually switched schools between the United States and Mexico before dropping out completely just after starting high school. This level of education does not support a presumption, without confirmation through adequate explanation and follow-up questioning, that she understood the *Miranda* warnings when read to her in English.

c)  Ponce's Language Skills

Of all the factors, Ponce's language skill is the most at-issue. Before Agent Almaraz read Ponce her rights, she asked Ponce several "biographical questions" as a tactic to make Ponce comfortable eliciting information. (*See* Dkt. No. 102 at 169). She asked Ponce simple questions that almost anyone with a rudimentary understanding of English would understand, such as "What is your address," and "Are your mom and dad still together?" (Gov. Ex. 20A at 7, 9). Even in response to these basic questions, Ponce responded with a few words in a mix of Spanish and English. (*Id.*). Ponce never initiated a discussion with the agents on any topic, including the nature of her criminal charges, which would have indicated an understanding of her rights. *See Alvarado*, 898 F.2d at 991. Ponce only spoke in response to a question.

24 / 26

After Agent Almaraz read Ponce her rights, she questioned Ponce in English about the alleged crime. (Gov. Ex. 20A at 17). Ponce gave long, narrative answers in Spanish. (*See id.*). Agent Almaraz interjected with clarifying questions in English, but Ponce was speaking in rapid Spanish. (*Id.* at 17–21). In one instance, Ponce answered a question in Spanish. (*Id.* at 63). Agent Jensen interrupted her answer in Spanish, asking her to speak in English because his Spanish was not good. (*Id.* at 63–64). Ponce attempted to answer in English, but quickly reverted back to Spanish. (*Id.* at 64; Gov. Ex. 20 at 37:53–38:09).

Agent Almaraz testified at the hearing that in her experience, it is common in Laredo for one person to converse exclusively in English, while one person speaks entirely in Spanish. (Dkt. No. 102 at 178). This type of conversation may suffice in casual day-to-day conversations, but the fact that an interrogee responds to questions in another language is not indicative that she understood the *Miranda* warnings and the rights guaranteed therein.

Because Ponce speaks predominantly in Spanish throughout the interview, the Court cannot infer that she sufficiently understood her rights that were read to her in English. Furthermore, Ponce never answered the question of whether she understood her rights and the waiver of those rights. She only signed the waiver form after being told, simply, "This is about talking to us." This factor weighs in favor of Ponce.

### d) Ponce's Demeanor During the Interrogation

Finally, the Fifth Circuit has observed that a suspect who listens to questions, responds appropriately and logically, and provides information in a logical manner is both likely to understand any warnings given and unlikely to be under the influence of any intoxicants. *Blanco*, 2019 WL 3781605, at *3 (citing *United States v. Reynolds*, 367 F.3d 294, 299 (5th Cir. 2004)).

Here, in almost an hour-long interrogation, Ponce only once said "What?"—albeit in Spanish. (Gov. Ex. 20A at 22). Agents Almaraz and Jensen exclusively questioned Ponce in English, and Ponce answered each question predominantly in Spanish. Ponce appeared nervous to Agent Almaraz, but she did not hesitate when speaking. (Dkt. No. 102 at 185). There was no evidence that Ponce was under the influence of any substance. Thus, the factor of Ponce's demeanor weighs in favor of the Government.

The question is whether the Government has produced enough evidence to establish that Ponce had full awareness of both the nature of her Fifth Amendment rights as outlined in *Miranda* and the consequences of waiving them. In this case, the agents were interviewing an eighteen-year-old, with no experience in the criminal justice system. Most of her education was in ESL classes, and she indicated that her preferred language was Spanish. Despite this, the agents interviewed Ponce exclusively in English, without an interpreter. Ponce was given an English *Miranda* waiver form, which was read-through once with her, without questions about whether she understood each right. After expressing hesitation about signing the waiver form, she finally did so after she was told, "This is about talking to us." Although Ponce ultimately signed the English waiver form, the Government has not tipped the scale to prove that by a preponderance of the evidence, Ponce's *Miranda* waiver was knowing, voluntary, and intelligent. Therefore, her post-arrest statement is suppressed.

### III.    Conclusion

Based on the foregoing, Defendant Angela Ruby Ponce's Motion to Suppress Evidence, (Dkt. No. 47), is **GRANTED in part**, **DENIED in part**. Defendant Ponce's statements made to agents during her interview are suppressed. Defendant Oscar Axel Flores' Motion to Suppress Stop, Search, and Statement Evidence, (Dkt. No. 44), is **DENIED** in its entirety.

It is so **ORDERED**.

**SIGNED** on September 3, 2024.

John A. Kazen
United States District Judge

26 / 26